# EXHIBIT 1

America. This transformation is not without enormous dangers and challenges, but consider how much worse it would have been if a pro-bin Laden movement were fueling this transformation.

It is plain we need more of what we had post-9/11 now. I am not naive. I know it cannot be conjured up or wished into existence. But if we are optimistic, if we are inspired by the Americans who died here, if we truly understand our shared history and the sacred place compromise and rationality hold at the very center of the formation of our Nation and the structure of our Constitution, then we can again take up the mantle of shared sacrifice and common purpose that we wore after 9/11 and apply some of those behaviors to the problems we now confront.

The reality of our current political climate is that both sides are off in their corners; the common enemy is faded. Some see Wall Street as the enemy many others see Washington, DC, as the enemy and to still others any and all government is the enemy.

I believe the greatest problem we face is the belief that we can no longer confront and solve the problems and challenges that confront us; the fear that our best days may be behind us; that, for the first time in history, we fear things will not be as good for our kids as they are for us. It is a creeping pessimism that cuts against the can-do and will-do American spirit. And, along with the divisiveness in our politics, it is harming our ability to create the great works our forbears accomplished: building the Empire State building in the teeth of the Great Depression, constructing the Interstate Highway System and the Hoover Dam, the Erie Canal, and so much more.

While governmental action is not the whole answer to all that faces us, it is equally true that we cannot confront the multiple and complex challenges we now face with no government or a defanged government or a dysfunctional government.

As we approach the 10th anniversary of 9/11, the focus on what happened that day intensifies—what we lost, who we lost, and how we reacted—it becomes acutely clear that we need to confront our current challenges imbued with the spirit of 9/11 and determine to make our government and our politics worthy of the sacrifice and loss we suffered that day.

To return to de Tocqueville, he also remarked that:

The greatness of America lies not in being more enlightened than any other nation, but rather in her ability to repair her faults.

So, like the ironworkers and operating engineers and trade workers who miraculously appeared at the pile hours after the towers came down with blowtorches and hard hats in hand, let's put on our gloves, pick up our hammers and get to work fixing what ails the body politic. It is the least we can do to honor those we lost.

I yield the floor and suggest the absence of a quorum.

The PRESIDING OFFICER (Mr. BROWN of Ohio). The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. SESSIONS. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## CONCLUSION OF MORNING BUSINESS

The PRESIDING OFFICER. Morning business is closed.

---

## LEAHY-SMITH AMERICA INVENTS ACT

The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of H.R. 1249, which the clerk will report by title.

The assistant legislative clerk read as follows:

An Act (H.R. 1249) to amend title 35, United States Code, to provide for patent reform.

### AMENDMENT NO. 600

Mr. SESSIONS. Mr. President, I ask unanimous consent to call up my amendment No. 600, which is at the desk.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Alabama [Mr. SESSIONS], for himself, Mr. MANCHIN, Mr. COBURN, and Mr. LEE, proposes an amendment numbered 600.

Mr. SESSIONS. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

### AMENDMENT NO. 600

(Purpose: To strike the provision relating to the calculation of the 60-day period for application of patent term extension)

On page 149, line 20, strike all through page 150, line 16.

Mr. SESSIONS. Mr. President, the amendment that I have offered is a very important amendment. It is one that I believe is important to the integrity of the U.S. legal system and to the integrity of the Senate. It is a matter that I have been wrestling with and objecting to for over a decade. I thought the matter had been settled, frankly, but it has not because it has been driven by one of the most ferocious lobbying efforts the Congress maybe has seen.

The House patent bill as originally passed out of committee and taken to the floor of the House did not include a bailout for Medco, the WilmerHale law firm, or the insurance carrier for that firm, all of whom were in financial jeopardy as a result of a failure to file a patent appeal timely.

I have practiced law hard in my life. I have been in court many times. I

spent 12 years as a U.S. Attorney and tried cases. I am well aware of how the system works. The way the system works in America, you file lawsuits and you are entitled to your day in court. But if you do not file your lawsuit in time, within the statute of limitations, you are out.

When a defendant raises a legal point of order—a motion to dismiss—based on the failure of the complaining party to file their lawsuit timely, they are out. That happens every day to poor people, widow ladies. And it does not make any difference what your excuse is, why you think you have a good lawsuit, why you had this idea or that idea. Everyone is required to meet the same deadlines.

In Alabama they had a situation in which a lady asked a probate judge when she had to file her appeal by, and the judge said: You can file it on Monday. As it turned out, Monday was too late. They went to the Alabama Supreme Court, and who ruled: The probate judge—who does not have to be a lawyer—does not have the power to amend the statute of limitations. Sorry, lady. You are out.

Nobody filed a bill in the Congress to give her relief, or the thousands of others like her every day. So Medco and WilmerHale seeking this kind of relief is a big deal. To whom much has been given, much is required. This is a big-time law firm, one of the biggest law firms in America. Medco is one of the biggest pharmaceutical companies in the country. And presumably the law firm has insurance that they pay to insure them if they make an error. So it appears that they are not willing to accept the court's ruling.

One time an individual was asking me: Oh, JEFF, you let this go. Give in and let this go. I sort of as a joke said to the individual: Well, if WilmerHale will agree not to raise the statute of limitations against anybody who sues their clients if they file a lawsuit late, maybe I will reconsider. He thought I was serious. Of course WilmerHale is not going to do that. If some poor person files a lawsuit against someone they are representing, and they file it one hour late, WilmerHale will file a motion to dismiss it. And they will not ask why they filed it late. This is law. It has to be objective. It has to be fair.

You are not entitled to waltz into the U.S. Congress—well connected—and start lobbying for special relief.

There is nothing more complicated about that than this. So a couple of things have been raised. Well, they suggest, we should not amend the House patent bill, and that if we do, it somehow will kill the legislation. That is not so. Chairman LEAHY has said he supports the amendment, but he doesn't want to vote for it because it would keep the bill from being passed somehow.

It would not keep it from being passed. Indeed, the bill that was

the primary goal of the U.S. Patent and Trademark Office.

Mr. KYL. Madam President, I rise today to say a few words about aspects of the present bill that differ from the bill that passed the Senate in March. I commented at length on the Senate bill when that bill was before this body. Since the present bill and the Senate bill are largely identical, I will not repeat what I said previously, but will simply refer to my previous remarks, at 157 Cong. Rec. 1368–80, daily ed. March 8, 2011, which obviously apply to the present bill as well.

As I mentioned earlier, Mr. SMITH negotiated his bill with Senators LEAHY, GRASSLEY, and me as he moved the bill through the House of Representatives. The final House bill thus represents a compromise, one which the Senate supporters of patent reform have agreed to support in the Senate. The provisions that Mr. SMITH has added to the bill are ones that we have all had an opportunity to consider and discuss, and which I fully support.

Section 19(d) of the present bill adds a new section 299 to title 35. This new section bars joinder of accused infringers as codefendants, or consolidation of their cases for trial, if the only common fact and transaction among the defendants is that they are alleged to have infringed the same patent. This provision effectively codifies current law as it has been applied everywhere outside of the Eastern District of Texas. See *Rudd* v. *Lux Products Corp.*, 2011 WL 148052. (N.D. Ill. January 12, 2011), and the committee report for this bill at pages 54 through 55.

H.R. 1249 as introduced applied only to joinder of defendants in one action. As amended in the mark up and in the floor managers' amendment, the bill extends the limit on joinder to also bar consolidation of trials of separate actions. When this change was first proposed, I was skeptical that it was necessary. A review of legal authority, however, reveals that under current law, even if parties cannot be joined as defendants under rule 20, their cases can still be consolidated for trial under rule 42. For example, as the district court held in *Ohio* v. *Louis Trauth Dairy, Inc.*, 163 F.R.D. 500, 503 (S.D. Ohio 1995), "[e]ven when actions are improperly joined, it is sometimes proper to consolidate them for trial." The same conclusion was reached by the court in *Kenvin* v. *Newburger, Loeb & Co.*, 37 F.R.D. 473 (S.D.N.Y. 1965), which ordered severance because of misjoinder of parties, concluding that the claims against the defendants did not arise out of single transaction or occurrence, but then suggested the desirability of a joint trial, and expressly made its severance order without prejudice to a subsequent motion for consolidation under rule 42(a). Similarly, in *Stanford* v. *TVA*, 18 F.R.D. 152 (M.D. Tenn. 1955), a court found that the defendants had been misjoined, since the claims arose out of independent transactions, and ordered them severed. The

court subsequently found, however, that a common question existed and ordered the defendants' cases consolidated for trial.

That these cases are not just outliers is confirmed by Federal Practice and Procedure, which comments as follows at § 2382:

Although as a general proposition it is true that Rule 42(a) should be construed in harmony with the other civil rules, it would be a mistake to assume that the standard for consolidation is the same as that governing the original joinder of parties or claims. . . . [M]ore than one party can be joined on a side under Rule 20(a) only if there is asserted on behalf of or against all of them one or more claims for relief arising out of the same transaction or occurrence or series of transactions or occurrences. This is in addition to the requirement that there be some question of law or fact common to all the parties. But the existence of a common question by itself is enough to permit consolidation under Rule 42(a), even if the claims arise out of independent transactions.

If a court that was barred from joining defendants in one action could instead simply consolidate their cases for trial under rule 42, section 299's purpose of allowing unrelated patent defendants to insist on being tried separately would be undermined. Section 299 thus adopts a common standard for both joinder of defendants and consolidation of their cases for trial.

Another set of changes made by the House bill concerns the coordination of inter partes and postgrant review with civil litigation. The Senate bill, at proposed sections 315(a) and 325(a), would have barred a party or his real party in interest from seeking or maintaining an inter partes or postgrant review after he has filed a declaratory-judgment action challenging the validity of the patent. The final bill will still bar seeking IPR or PGR after a declaratory-judgment action has been filed, but will allow a declaratory-judgment action to be filed on the same day or after the petition for IPR or PGR was filed. Such a declaratory-judgment action, however, will be automatically stayed by the court unless the patent owner countersues for infringement. The purpose of allowing the declaratory-judgment action to be filed is to allow the accused infringer to file the first action and thus be presumptively entitled to his choice of venue.

The House bill also extends the deadline for allowing an accused infringer to seek inter partes review after he has been sued for infringement. The Senate bill imposed a 6-month deadline on seeking IPR after the patent owner has filed an action for infringement. The final bill extends this deadline, at proposed section 315(b), to 1 year. High-technology companies, in particular, have noted that they are often sued by defendants asserting multiple patents with large numbers of vague claims, making it difficult to determine in the first few months of the litigation which claims will be relevant and how those claims are alleged to read on the defendant's products. Current law imposes no deadline on seeking inter

partes reexamination. And in light of the present bill's enhanced estoppels, it is important that the section 315(b) deadline afford defendants a reasonable opportunity to identify and understand the patent claims that are relevant to the litigation. It is thus appropriate to extend the section 315(b) deadline to one year.

The final bill also extends intervening rights to inter partes and postgrant review. The bill does not allow new matter to be introduced to support claims in IPR and PGR and does not allow broadening of claims in those proceedings. The aspect of intervening rights that is relevant to IPR and PGR is section 252, first paragraph, which provides that damages accrue only from the date of the conclusion of review if claim scope has been substantively altered in the proceeding. This restriction applies even if the amendment only narrowed the scope of the claims. *See Engineered Data Products, Inc.* v. *GBS Corp.*, 506 F.Supp.2d 461, 467 (D. Colo. 2007), which notes that "the Federal Circuit has routinely applied the intervening rights defense to narrowing amendments." When patent-defeating prior art is discovered, it is often impossible to predict whether that prior art will be found to render the entire invention obvious, or will only require a narrowing amendment. When a challenger has discovered such prior art, and wants to practice the invention, intervening rights protect him against the risk of gong forward—provided, of course, that he is correct in his judgment that the prior art at least requires a substantive narrowing of claims.

The final bill also adds a new subsection to proposed section 257, which authorizes supplemental examination of patents. The new subsection provides that the Director shall refer to the U.S. Attorney General any "material fraud" on the Office that is discovered during the course of a Supplemental Examination. Chairman Smith's explanation of this addition, at 157 Cong. Rec. E1182–83 (daily ed. June 23, 2011), clarifies the purpose and effect of this new provision. In light of his remarks, I find the addition unobjectionable. I would simply add to the Chairman's remarks that, in evaluating whether a fraud is "material" for purpose of referral, the Director should look to the Federal Circuit's decision in *Therasense, Inc.* v. *Becton, Dickinson and Co.*, ____ F.3d ____, 2011 WL 2028255 (May 25, 2011). That case holds, in relevant part, that:

[T]he materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.

Finally, perhaps the most important change that the House of Representatives has made to the America Invents

Act is the addition of a prior-commercial-use defense. Current law, at section 273, creates a defense of prior-user rights that applies only with respect to business-method patents. The final bill rewrites section 273, creating a PCU defense that applies to all utility patents.

University researchers and their technology-transfer offices had earlier objected to the creation of such a defense. Their principal concern was that the defense would lead to a morass of litigation over whether an infringer was entitled to assert it, and the expense and burden of this litigation would ultimately prevent universities and small companies from enforcing valid patents. The compromise reached in the House of Representatives addresses university concerns by requiring a defendant to show that he commercially used the subject matter that infringes the patent at least 1 year before the patent owner either filed an application or disclosed the invention to the public. The House compromise also precludes assertion of the defense against most university-owned patents.

The PCU defense is similar to the prior-user right that exists in the United Kingdom and Germany. The defense is a relatively narrow one. It does not create a general license with respect to the patented invention, but rather only allows the defendant to keep making the infringing commercial use that he establishes that he made 1 year before the patentee's filing or disclosure. The words ''subject matter,'' as used in subsection (a), refer to the infringing acts of the defendant, not to the entire patented invention. An exception to this limit, which expands the defense beyond what would be allowed in the United Kingdom, appears in subsection (e)(3), which allows the defendant to increase the quantity or volume of the use that he establishes that he made of the invention. Subsection (e)(3) also confirms that the defendant may improve or otherwise modify his activities in ways that do not further infringe the patent, although one would think that this would go without saying.

The PCU defense is principally designed to protect the use of manufacturing processes. For many manufacturing processes, the patent system presents a catch-22: if the manufacturer patents the process, he effectively discloses it to the world. But patents for processes that are used in closed factories are difficult to police. It is all but impossible to know if someone in a factory in China is infringing such a patent. As a result, unscrupulous foreign and domestic manufacturers will simply use the invention in secret without paying licensing fees. Patenting such manufacturing processes effectively amounts to giving away the invention to competitors. On the other hand, if the U.S. manufacturer does not patent the process, a subsequent party may obtain a patent for it, and the U.S. manufacture will be forced to stop using a process that he was the first to invent and which he has been using for years.

The prior-commercial-use defense provides relief to U.S. manufacturers from this Catch-22, allowing them to make long-term use of a manufacturing process without having to give it away to competitors or run the risk that it will be patented out from under them.

Subsection (a) expands the defense beyond just processes to also cover products that are used in a manufacturing or other commercial process. Generally, products that are sold to consumers will not need a PCU defense over the long term. As soon as the product is sold to the public, any invention that is embodied or otherwise inherent in that product becomes prior art and cannot be patented by another party, or even by the maker of the product after the grace period has expired. Some products, however, consist of tools or other devices that are used only by the inventor inside his closed factory. Others consist of substances that are exhausted in a manufacturing process and never become accessible to the public. Such products will not become prior art. Revised section 273 therefore allows the defense to be asserted with respect to such products.

The defense can also be asserted for products that are not used to make a useful end result that is sold to others, but that are used in an internal commercial process. This would include, for example, customized software that is used to run a company's human-resources system. So long as use of the product is integrated into an ongoing commercial process, and not merely fleeting or experimental or incidental to the enterprise's operations, the PCU defense can be asserted with respect to that product.

The present bill requires the defendant to commercially use the invention in order to be able to assert the defense. Chairman SMITH has suggested, at 157 Cong. Rec. E1219 (daily ed. June 28, 2011), that in the future Congress should expand the defense so that it also applies when a company has made substantial preparations to commercially use an invention. Some have also suggested that the defense should be expanded to cover not just using, but also making and selling an invention if substantial preparations have been made to manufacture the invention. This would expand the defense to more fully compensate for the repeal of current section 102(g), which allows a party to invalidate a patent asserted against it if the party can show that it had conceived of the invention earlier and diligently proceeded to commercialize it.

On the one hand, universities and others have expressed concern that a ''substantial preparations'' predicate for asserting the PCU defense would lead to expensive and burdensome litigation over whether a company's activities reflect conception and diligent commercialization of the invention. Some argue that it is often the case that different companies and researchers are working on the same problem, and it is easy for the unsuccessful par-

ties to later recharacterize their past efforts as capturing or diligently implementing the successful researcher's invention. Questions have also arisen as to how tentative preparations may be and still qualify as ''substantial preparations.'' For example, if a company had not broken ground for its factory, but had commissioned an architect to draw up plans for it, would that qualify? Would taking out a loan to build the factory qualify as substantial preparations?

On the other hand, proof of conception and diligent commercialization are currently used to apply section 102(g)(2), and I have not heard complaints that the current defense has resulted in overly burdensome litigation.

In the end, however, a substantial-preparations predicate is not included in this bill simply because that was the agreement that was struck between universities and industry in the House of Representatives last summer, and we are now effectively limited to that agreement. Perhaps this issue can be further explored and revisited in a future Congress, though I suspect that many members will want a respite from patent issues after this bill is completed.

The final bill also drops the requirement of a showing of a reduction to practice that previously appeared in subsection (b)(1). This is because the use of a process, or the use of product in a commercial process, will always constitute a reduction to practice.

One change made by the original House bill that proved contentious is the expansion of the personal nature of the defense, now at subsection (e)(1)(A), to also include uses of the invention made by contractors and vendors of the person asserting the defense. The House bill originally allowed the defendant to assert the defense if he performed the commercial use or ''caused'' its performance. The word ''caused,'' however, could be read to include even those uses that a vendor made without instructions or even the contemporaneous knowledge of the person asserting the defense. The final bill uses the word ''directed,'' which limits the provision only to those third-party commercial uses that the defendant actually instructed the vendor or contactor to use. In analogous contexts, the word ''directed'' has been understood to require evidence that the defendant affirmatively directed the vendor or contractor in the manner of the work or use of the product. See, for example, *Ortega* v. *Puccia,* 75 A.D. 54, 59, 866 N.Y.S.2d 323, 328 (N.Y. App. 2008).

Subsection (e)(1)(A)'s reference to entities that ''control, are controlled by, or under common control with'' the defendant borrows a term that is used in several federal statutes. See 12 U.S.C. 1841(k), involving bank holding companies, 15 U.S.C. 78c(a)(4)(B)(vi), involving securities regulation, 15 U.S.C. 6809(6), involving financial privacy, and 49 U.S.C. 30106(d)(1), involving motor vehicle safety. Black's Law Dictionary 378 (9th ed. 2009) defines ''control'' as the ''direct or indirect power to govern

the management and policies of a person or entity, whether through ownership of securities, by contract, or otherwise; the power or authority to manage, direct, or oversee.''

A few other aspects of the PCU defense merit brief mention. Subsection (e)(5)(A), the university exception, was extended to also include university technology-transfer organizations, such as the Wisconsin Alumni Research Foundation. Subparagraph (B), the exception to the university exception, is only intended to preclude application of subparagraph (A) when the federal government is affirmatively prohibited, whether by statute, regulation, or executive order, from funding research in the activities in question.

In the course of the recodification of former subsection (a)(2) as new (c)(2), the former's subparagraph (B) was dropped because it is entirely redundant with subparagraph (A).

Finally, subsection (e)(4), barring assertion of the defense if use of the subject matter has been abandoned, should not be construed to necessarily require continuous use of the subject matter. It is in the nature of some subject matter that it will be used only periodically or seasonally. If such is the case, and the subject has been so used, its use has not been abandoned.

I would also like to take a moment to once again address the question of the grace period created by this bill. During the House and Senate debates on the bill, opponents of the first-to-file system have occasionally asserted that they oppose the bill's move to first to file because it weakens the grace period. See 157 Cong. Rec. S1094, S1096, S1112 (daily ed. March 2, 2011), and 157 Cong. Rec. H4424, H4430 (daily ed. June 22, 2011).

Some of these arguments are difficult to understand, in part because opponents of first to file have used the term ''grace period'' to mean different things. Some have used the term to mean the period between the time when the inventor conceives of the invention and the time when he files a full or even provisional application. Obviously, if the ''grace period'' is defined as the first-to-invent system, then the move to first to file eliminates that version of the grace period. Others, however, have suggested that public uses, sales, or ''trade secrets'' will bar patenting under new section 102(b), even if they consist of activities of the inventor during the year before filing.

This is not the case, and I hope that courts and executive officials interpreting this act will not be misled by arguments made by opponents of this part of the bill. The correct interpretation of section 102 and the grace period is that which has been consistently advanced in the 2007 and 2011 committee reports for this bill, see Senate Report 110–259, page 9, and House Report 112–98, page 43, as well as by both Chairman SMITH and Chairman LEAHY, see 157 Cong. Rec. S1496–97 (daily ed. March

9, 2011), and 157 Cong. Rec. H4429 (daily ed. June 22, 2011). These two chairmen are the lead sponsors and authorizing chairmen of this year's bills, which are identical with respect to section 102. As Chairman SMITH most recently explained in his June 22 remarks, ''contrary to current precedent, in order to trigger the bar in new 102(a) in our legislation, an action must make the patented subject matter 'available to the public' before the effective filing date.'' Therefore, ''[i]f an inventor's action is such that it triggers one of the bars under 102(a), then it inherently triggers the grace period in section 102(b).''

When the committee included the words ''or otherwise available to the public'' in section 102(a), the word ''otherwise'' made clear that the preceding items are things that are of the same quality or nature. As a result, the preceding events and things are limited to those that make the invention ''available to the public.'' The public use or sale of an invention remains prior art, thus making clear that an invention embodied in a product that has been sold to the public more than a year before an application was filed, for example, can no longer be patented. Once an invention has entered the public domain, by any means, it can no longer be withdrawn by anyone. But public uses and sales are prior art only if they make the invention available to the public.

In my own remarks last March, I cited judicial opinions that have construed comparable legislative language in the same way. Since that time, no opponent of the first-to-file transition has identified any caselaw that reads this legislative language any other way, nor am I aware of any such cases. I would hope that even those opponents of first to file who believe that supporters of the bill cannot rely on committee reports and sponsors' statements would at least concede that Congress is entitled to rely on the consistent judicial construction of legislative language.

Finally, I would note that the interpretation of 102 that some opponents appear to advance—that nondisclosing uses and sales would remain prior art, and would fall outside the 102(b) grace period—is utterly irrational. Why would Congress create a grace period that allows an invention that has been disclosed to the world in a printed publication, or sold and used around the world, for up to a year, to be withdrawn from the public domain and patented, but not allow an inventor to patent an invention that, by definition, has not been made available to the public? Such an interpretation of section 102 simply makes no sense, and should be rejected for that reason alone.

Let me also address two other misstatements that have been made about the bill's first-to-file system. In remarks appearing at 157 Cong. Rec. S1095 (daily ed. March 2, 2011), it was suggested that a provisional applica-

tion filed under the first-to-file system will be vulnerable to an attack that the inventor failed to disclose the best mode of the invention. This is incorrect. Section 15 of this bill precludes the use of the best-mode requirement as a basis for cancelling a claim or holding it invalid. It was also suggested, at the same place in the record, that discovery would not be allowed in the derivation proceedings created by section 3(i) of the bill. That is incorrect. Section 24 of title 35 allows discovery in any ''contested case.'' The Patent Office's regulations, at 37 CFR 41.2(2), indicate that contested cases included Board proceedings such as interferences. It is not apparent to me why these laws and regulations would suggest anything other than that discovery will be allowed in derivation proceedings.

Finally, let me close by commenting on section 18 of the bill. Some legitimate interests have expressed concern that non-business-method patents will be subject to challenge in this proceeding. I have been asked to, and am happy to, reiterate that technological inventions are excluded from the scope of the program, and that these technological inventions include inventions in the natural sciences, engineering, and computer operations—and that inventions in computer operations obviously include software inventions.

This does not mean that a patent is ineligible for review simply because it recites software elements or has been reduced to a software program. If that were the case, then very few of even the most notorious business-method patents could be reviewed under section 18. Rather, in order to fall within the technological-invention exclusion, the invention must be novel as software. If an invention recites software elements, but does not assert that it is novel as software, or does not colorably appear to be so, then it is not ineligible for review simply because of that software element. But an actual software invention is a technological invention, and is not subject to review under section 18.

Mr. LEVIN. Madam President, I support the America Invents Act.

Right now, as our economy struggles to recover, this legislation is needed to help create jobs and keep our manufacturers competitive. It will further strengthen and expand the ability of our universities to conduct research and turn that research into innovative products and processes that benefit Michigan and our Nation.

Because of this legislation, we will be able to see that boost up close in my home State of Michigan, where a new satellite Patent and Trademark Office will be established in Detroit. This office will help modernize the patent system and improve the efficiency of patent review and the hiring of patent examiners.

In addition, in an important victory after years of effort to address the problem, section 14 of the act finally